**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Duane Gerber, an individual; and TDL Professionals, Inc., a Utah corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>Wells Fargo Bank, N.A., a California Corporation; MTC Financial, Inc., dba Trustee Corps,<br><br>Defendants. | No. CV 11-01083-PHX-NVW<br><br>**ORDER** |

Before the Court is "Wells Fargo Bank, N.A.'s Motion to Dismiss Plaintiff's First Amended Complaint" (Doc. 30). For the reasons stated below, the motion will be denied.

**I.    LEGAL STANDARD**

To state a claim for relief under Fed. R. Civ. P. 8(a), a plaintiff must make "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). This "short and plain statement" must also be "plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A claim is plausible if it contains "[f]actual allegations [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and to permit a reasonable inference that the defendant is liable for the conduct alleged, *Iqbal*, 129 S. Ct. at 1949. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court

1  to draw on its judicial experience and common sense." *Id*. at 1950.  A proper complaint
2  needs no "formulaic recitation of the elements of a cause of action," *see Twombly*, 550
3  U.S. at 555, but the plaintiff must at least "allege sufficient facts to state the elements of
4  [the relevant] claim," *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th
5  Cir. 2008).

6      If a plaintiff alleges a fraud-based cause of action, Fed. R. Civ. P. 9(b) requires the
7  plaintiff to "set forth more than the neutral facts necessary to identify the transaction.
8  The plaintiff must set forth what is false or misleading about a statement, and why it is
9  false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc).  The
10 plaintiff should also allege the identity of the person who made the misrepresentation; the
11 time, place, content, and manner of the misrepresentation; the persons who heard, read, or
12 otherwise received the misrepresentation; and the injury caused by reliance on the
13 misrepresentation.  2 James Wm. Moore et al., *Moore's Federal Practice* § 9.03[1][b] (3d
14 ed. 2010).

15     In evaluating a motion to dismiss, courts accept all of the plaintiff's plausible
16 factual allegations as true and construe the pleadings in a light most favorable to the
17 plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  The Court generally
18 does not look beyond the pleadings, but may take judicial notice of matters of public
19 record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

20 **II.    BACKGROUND**

21     Some time ago, a homeowner in Avondale, Arizona, defaulted on her house
22 payment obligations to Defendant Wells Fargo, which held both the senior lien and a
23 junior lien.  The junior lien secured a home equity line of credit.  Both liens were
24 properly recorded.

25     At Wells Fargo's direction, a trustee held a trustee's sale in August 2010 on the
26 junior lien only, although Wells Fargo had yet to sell the senior lien.  The Notice of
27 Trustee's Sale did not specifically state that the interest for sale was a junior lien, nor did
28 it mention the senior lien, but it warned that "[c]onveyance of the property shall be

1  without warranty, express or implied, and subject to all liens, claims or interest having a
2  priority senior to the Deed of Trust.  The Trustee shall not express an opinion as to the
3  condition of title."  (Doc. 7-1 at 17.)

4         Plaintiff Duane Gerber was the high bidder for the Avondale junior lien, paying
5  $68,226.  Gerber's original complaint did not specifically say so, but suggested that he
6  bid under the impression that the interest for sale was a senior lien.  The original
7  complaint said nothing about whether Gerber performed a title search.  Gerber later
8  conveyed his newly-bought interest to his company, TDL Professionals, Inc.  The
9  original complaint likewise said nothing about whether TDL performed a title search.

10         In January 2011, Wells Fargo noticed a new trustee's sale for the Avondale
11  property.  It appears that this second trustee's sale was the first Gerber (or TDL) knew of
12  the senior lien, but again, the original complaint did not specifically say so.

13         Facing the possibility of losing the $68,000 investment, Gerber and TDL
14  (collectively, "Gerber," unless the context requires otherwise) filed the instant action in
15  Maricopa County Superior Court claiming that Wells Fargo had engaged in statutory
16  consumer fraud, and further claiming that "Wells Fargo has an established pattern or
17  practice of conducting trustee's sales on junior liens when it also holds a senior lien
18  . . . [¶] . . . with the intent and hope that unwary consumers will be deceived and that
19  Wells Fargo will be [*sic*] receive more than the fair market value of the property."  (Doc.
20  1-1 at 5.)  The Superior Court granted a temporary restraining order against the trustee's
21  sale, after which Wells Fargo removed to this Court.  Wells Fargo moved to dismiss.

22         The Court granted the motion to dismiss, reasoning that Wells Fargo's scheme, as
23  alleged by Gerber, would amount to consumer fraud, but also that Gerber had not
24  adequately pled the elements of such fraud.  (*See generally* Doc. 26.)  The Court gave
25  Gerber leave to amend regarding issues of home value (whether the senior lien was
26  undersecured, making the junior lien effectively worthless), reliance (what Gerber or
27  TDL knew or did not know), and standing (whether he or TDL had suffered the injury).
28

Gerber's amended complaint is substantially similar to his original complaint, but adds that he has a good faith reason to believe that the senior lien was undersecured, that he "did not know or realize that the trustee's sale was on Wells Fargo's junior lien rather than the senior lien on the property," and that he has assigned his claims to TDL. (Doc. 27 ¶¶ 12, 14, 20.) The amended complaint says nothing about consulting a title company. Wells Fargo has again moved to dismiss.

## III. ANALYSIS

### A. Preemption

This Court's order granting Wells Fargo's first motion to dismiss stated that

> if a trust beneficiary possesses both the junior and senior lien, and if the beneficiary knows or should know that the collateral no longer fully secures the senior lien, then intentionally causing the trustee to place the junior lien up for sale first is an inherently "deceptive act" and creates a "false pretense" under the Consumer Fraud Act . . . .
>
> * * *
>
> Because Wells Fargo held both the junior and senior liens, it can be liable for deceptive practices . . . if it knew or should have known that the senior lien was undersecured but intentionally auctioned the junior lien first.

(Doc. 26 at 7–8.) Wells Fargo now argues that this ruling will force it

> to conduct property appraisals prior to foreclosing under junior deeds of trust to confirm whether senior deeds of trust are undersecured, and then either forego foreclosing on junior deeds of trust when they also own senior deeds of trust, or affirmatively disclose the existence of senior deeds of trust when foreclosing.

(Doc. 30 at 7–8.) Wells Fargo claims that these supposed requirements impermissibly burden its lending-related activities and are therefore preempted by the Home Owners Loan Act (HOLA) or the National Bank Act (NBA).

The Court does not necessarily agree with Wells Fargo's interpretation of the previous order. Nonetheless, as explained below: (1) HOLA does not apply to Wells

- 4 -

Fargo, (2) NBA does apply to Wells Fargo, but (3) NBA does not preempt the application of the Consumer Fraud Act here.

### 1. HOLA Preemption

Wells Fargo's HOLA preemption argument rests on the applicability of 12 C.F.R. § 560.2, a regulation promulgated by the Office of Thrift Supervision (OTS). Section 560.2 states that HOLA and its implementing regulations

> preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.

12 C.F.R. § 560.2(a). Certain types of state laws may escape preemption — *e.g.*, real property law and torts — if "they only incidentally affect the lending operations of Federal savings associations." *Id.* § 560.2(c).

HOLA preemption is powerful. While there is usually "a strong presumption against federal preemption of state law governing historic police powers," that presumption is reversed when applying HOLA. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008). Such so-called "field preemption" presumes that "'Congress must have intended to leave *no room* for the states to supplement [federal law].'" *Aguayo v. U.S. Bank*, 653 F.3d 912, 921 (9th Cir. 2011) (*quoting City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002) (emphasis added by *Aguayo*)).

Wells Fargo is not a federal savings association and not regulated by the OTS, but (i) Gerber originally acquired his loan through World Savings Bank (a federal savings bank), (ii) Wachovia (also a federal savings bank) acquired World Savings, and (iii) Wells Fargo acquired Wachovia. Wells Fargo argues that HOLA preemption "sticks" to any loan originating with a federal savings bank.

The plain language of § 560.2 demonstrates that this argument is without merit. HOLA preempts "state laws affecting the operations of federal savings associations" and leaves room for state laws that "only incidentally affect the lending operations of Federal savings associations." Application of the Consumer Fraud Act to Wells Fargo would not affect the "operations" of a federal savings association — and especially not the "lending operations" — because Wells Fargo is not a federal savings association.

Wells Fargo has nonetheless cited several cases stating that Wells Fargo enjoys the HOLA preemption enjoyed by World Savings and Wachovia. But as authority for that proposition, these cases cite either (a) nothing, (b) each other, or (c) generic statements of law about corporations succeeding to the rights of the entities they acquire. *DeLeon v. Wells Fargo Bank, N.A.*, 729 F. Supp. 2d 1119 (N.D. Cal. 2010); *Valverde v. Wells Fargo Bank, N.A.*, No. C-11-2423 SC, 2011 WL 3740836, at *4 (N.D. Cal. Aug. 25, 2011); *Parmer v. Wachovia*, No. C 11-0672 PJH, 2011 WL 1807218, at *1 (N.D. Cal. Apr. 22, 2011); *Haggarty v. Wells Fargo Bank, N.A.*, C 10-02416 CRB, 2011 WL 445183, at *4 (N.D. Cal. Feb. 2, 2011); *Guerrero v. Wells Fargo Bank, N.A.*, No. CV 10-5095-VBF(AJWx), 2010 U.S. Dist. LEXIS 96261, at *8 (C.D. Cal. Sept. 14, 2010). But preemption is not some sort of asset that can be bargained, sold, or transferred. HOLA preemption was created by the OTS for the benefit of *federal savings associations*, and § 560.2 plainly seeks to avoid burdening the operations of *federal savings associations*. Wells Fargo is not a federal savings association, and its cited cases are therefore not persuasive. HOLA preemption does not apply to Wells Fargo.

### 2. NBA Preemption

Unlike HOLA, NBA applies to Wells Fargo, a national bank. NBA's implementing regulations, promulgated by the Office of the Comptroller of the Currency (OCC), contain a preemption provision reminiscent of HOLA's: "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a). But "there are subtle differences between the regulation of savings and loan institutions and national

bank associations." *Aguayo*, 653 F.3d at 921. Most importantly, "the OCC has explicitly avoided full field preemption in its rulemaking and has not been granted full field preemption by Congress." *Id*. at 921–22. Despite the similarity in language between the OTS's and OCC's preemption regulations, the Ninth Circuit rejects applying the OTS/HOLA analysis to OCC/NBA questions. *Id*. at 922.

The OCC's own interpretation of its rules supports treating NBA preemption separately from HOLA preemption. HOLA's and NBA's respective preemption regulations contain similar lists of preempted state laws (discussed in more detail below), *compare* 12 C.F.R. § 560.2(b)(1)–(13) *with id*. § 34.4(a)(1)–(14), a fact of which the OCC was aware, *see* 69 Fed. Reg. 1904, 1911 n.56 (2004) ("The list is also substantially identical to the types of laws specified in a comparable regulation of the OTS. See 12 CFR 560.2(b)."). But the HOLA regulation states that the list is "illustrative" and "without limitation." *Id*. at § 560.2(b). By contrast, the NBA regulation contains no equivalent language, and an OCC interpretive letter confirms that this is a distinction with a difference: "the [NBA] rule *only* preempts the types and features of state laws pertaining to making loans and taking deposits that are *specifically listed* in the regulation." OCC Interpretive Letter No. 1005, 2004 WL 3465750 (June 10, 2004) (emphasis added). Accordingly, "[t]he [NBA] (and OCC regulations thereunder) does not 'preempt the field' of banking." *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010).

Without field preemption, the appropriate approach to analyzing NBA preemption claims is to return to the "two cornerstones" of "pre-emption jurisprudence":

> First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations and internal quotation marks omitted; alterations incorporated). While some courts have made sweeping statements about "the presumption against preemption of state law [being] inapplicable" to national banks "because there has been a history of significant federal presence in national banking," *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002), such statements must be qualified by their context. *Bank of America* dealt with San Francisco's attempt to prohibit banks from charging ATM fees to non-depositors, *id.* at 556 — a regulation obviously directed at the banking industry. But the Supreme Court has recently emphasized that national banks remain "subject to state laws of *general application* in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (emphasis added). Thus, national banks remain subject to state usury laws, contract laws, and laws regarding "acquisition and transfer of property." *Id.* (internal quotation marks omitted).

These are areas where there exists no history of significant federal presence. The areas at issue in this case likewise have no significant federal history. At its broadest, this case is about fraud. There has never been a significant federal presence in the area of fraud, at least not one thought to override state fraud laws. At its narrowest, this case is about foreclosure practices. Again, there has never been a federal presence here sufficient to displace the various types of state statutes governing foreclosure procedures. Indeed, foreclosure practices govern "acquisition and transfer of property," an area which the Supreme Court has already confirmed lies within states' presumed powers to regulate. *Id.*; *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541–42 (1994) ("the States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers"). Thus, the presumption against preemption continues to apply.

Beginning with the presumption against preemption, the question here is whether a "conflict" exists between "the letter or the general purposes of the NBA," *Watters*, 550 U.S. at 11, and the Consumer Fraud Act's prohibition established in this Court's previous order. For clarity, the Court repeats its Consumer Fraud Act conclusion from the prior order:

> [I]f a trust beneficiary possesses both the junior and senior lien, and if the beneficiary knows or should know that the collateral no longer fully secures the senior lien, then intentionally causing the trustee to place the junior lien up for sale first is an inherently "deceptive act" and creates a "false pretense" under the Consumer Fraud Act . . . .

(Doc. 26 at 7.) Wells Fargo's preemption argument arises not from this language directly, but from what it perceives as the efforts it must now necessarily take to avoid engaging in such deception: (1) appraise the property, and if the senior lien is undersecured then (2) either (a) abandon foreclosing on the junior lien or (b) disclose the senior lien when foreclosing on the junior lien.

The Court could locate no authority stating that preemption can arise from the efforts an entity must take to avoid engaging in inherently deceptive practices. The OCC has already warned national banks that state consumer fraud and deceptive practices acts may apply national banks. *See* OCC Advisory Letter AL 2002-3, 2002 WL 521380, at *1 (Mar. 22, 2002) ("Generally, a deceptive act or practice involves . . . acts or practices that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers. [¶] The consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation."). Presumably all of these laws impose some sort of duties on national banks, if only added training and supervision to prevent employees from engaging in deceptive acts. *See id.* at *5–6 (recommending that national banks take various ongoing actions to avoid violating unfair or deceptive practices laws). Thus, it is

not clear that federal law preempts the steps a bank must take to avoid violating the Consumer Fraud Act.

Nonetheless, assuming that the steps necessary to comply with the Consumer Fraud Act in this case might raise preemption concerns, the Court is not persuaded that Wells Fargo must go to the efforts it proposes. In particular, the "knew or should have known" standard imposes no additional requirements. Any reasonably informed individual in Arizona today should know that home values have sharply declined. It therefore makes little sense for Wells Fargo to claim it would need an appraisal to determine that the senior lien is undersecured. Wells Fargo's explanation at oral argument on the first motion to dismiss essentially concedes this point. Counsel stated that Wells Fargo's home equity division is usually wiped out if its home mortgage division forecloses first — and for that reason, Wells Fargo sometimes allows the home equity division to go first. (Doc. 26 at 6.) In short, Wells Fargo knows that junior liens are usually worthless because property values no longer secure the senior liens. Wells Fargo need appraise nothing to come to this conclusion.

But the Court need not resolve whether appraisals are required because disclosing the senior lien suffices. In its previous order, the Court expressly disclaimed any "opinion about a notice of trustee's sale that specifically warns of an undersecured senior lien." (*Id*. at 8 n.2.) Having further considered the issue, however, the Court concludes that disclosing the senior lien would remove the taint of deception from the transaction, regardless of the property's value or the seller's knowledge of the property value. The deception inherent in Wells Fargo's current practice, if it operates as alleged, is that no one other than those who misunderstand what they are bidding on would bid. Affirmatively disclosing the existence of its senior lien, whether in the notice of trustee's sale or through some other reasonable means, ensures that no bidder can reasonably think he or she will take the property outright by winning the trustee's sale. Of course, it may also scare away all bidders — but that is the heart of the problem presented by this case. In any event, the deception is removed.

Thus, although the Consumer Fraud Act does not require affirmative disclosure of the senior lien, it is one way a seller who holds both the junior and senior liens could avoid consumer fraud liability for selling the junior lien first. Assuming *arguendo* this step is required (or effectively the only way the avoid consumer fraud liability), the question is whether such a requirement is preempted as to national banks. In that regard, the OCC's own words establish the standard to follow: "the [NBA preemption rule] only preempts the types and features of state laws pertaining to making loans and taking deposits that are specifically listed in the regulation." OCC Interpretive Letter No. 1005, 2004 WL 3465750. As relevant to this case,[1] that "specific[] list[]" is as follows:

> (1) Licensing, registration (except for purposes of service of process), filings, or reports by creditors;
>
> (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;
>
> (3) Loan-to-value ratios;
>
> (4) The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
>
> (5) The aggregate amount of funds that may be loaned upon the security of real estate;
>
> (6) Escrow accounts, impound accounts, and similar accounts;

---

[1] The "regulation" referred to in the OCC interpretive letter is not one specific section of the Code of Federal Regulations, but a final rule published in the Federal Register that amended 12 C.F.R. § 34.4 (regarding real estate lending) and added §§ 7.4007, 7.4008, 7.4009 (regarding deposit-taking and non-real estate lending). 69 Fed. Reg. 1904, 1916–17 (2004). Only the regulations regarding real estate lending matter to this case, and the Court therefore treats the OCC's references to "rule" and "regulation" as synonymous with 12 C.F.R. § 34.4.

- 11 -

>   (7) Security property, including leaseholds;
>
>   (8) Access to, and use of, credit reports;
>
>   (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;
>
>   (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;
>
>   (11) Disbursements and repayments;
>
>   (12) Rates of interest on loans;
>
>   (13) Due-on-sale clauses except to the extent provided in 12 U.S.C. 1701j–3 and 12 CFR part 591; and
>
>   (14) Covenants and restrictions that must be contained in a lease to qualify the leasehold as acceptable security for a real estate loan.

12 C.F.R. § 34.4(a) (footnote omitted). This list does not contain anything about "foreclosure." Wells Fargo argues that "servicing" (within item 10) includes foreclosure. For two reasons, Wells Fargo's argument is not persuasive.

First, the OCC said that preemption applies only to those "types and features of state laws pertaining to making loans . . . that are *specifically listed* in the regulation." OCC Interpretive Letter No. 1005, 2004 WL 3465750 (emphasis added). The OCC went to the trouble of specificity concerning other phases of the loan's existence (*e.g.*, "processing," "origination") but did not list "foreclosure," and it is therefore difficult to assume that it meant to include it within a "servicing" catch-all. *Compare Mabry v. Superior Court*, 185 Cal. App. 4th 208, 231, 110 Cal. Rptr. 3d 201, 218 (2010) (noting, in the context of the HOLA/OTS regulation containing similar language to the NBA/OCC at issue here, "if [OTS] wanted to include foreclosure as within the preempted category of loan servicing, it would have been explicit").

- 12 -

Second, if "foreclosure" lurks within "servicing," then the necessary implication of Well Fargo's argument is that "types and features of state laws pertaining to" foreclosure are preempted. This would bring down the Deed of Trust Act and probably every state's laws regarding foreclosure. Reaching such a momentous conclusion would indeed require a showing that it was "the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565; *see also Mabry*, 185 Cal. App. 4th at 230–31, 110 Cal. Rptr. 3d at 217–18 ("[T[he *process of foreclosure* has traditionally been a matter of state real property law . . . . [W]e have not been cited to anything in the federal regulations that govern such things as initiation of foreclosure, notice of foreclosure sales, allowable times until foreclosure, or redemption periods." (emphasis in original; citations omitted)). Wells Fargo has made no such showing. Accordingly, "servicing" does not include "foreclosure," and state laws regulating foreclosure are therefore not preempted by NBA, including any requirement that may exist under the Consumer Fraud Act to disclose the presence of your senior lien when you choose to sell your junior lien first.

For thoroughness, however, the Court notes that even if "servicing" includes "foreclosure," a preemption finding would not be appropriate at this stage. Instead, the Court would be required to examine the state law at issue in light of 12 C.F.R. § 34.4's "savings clause." *See Aguayo*, 653 F.3d at 922 ("a reviewing court [must] read a statute or regulation in its entirety when performing a preemption analysis which, in [the case of OCC regulations like 12 C.F.R. § 34.4], requires the court to consider both the express preemption and savings clauses together"). Section 34.4's "savings clause" is as follows:

> State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers:
>
> (1) Contracts;
>
> (2) Torts;
>
> (3) Criminal law;

- 13 -

(4) Homestead laws specified in 12 U.S.C. 1462a(f);

(5) Rights to collect debts;

(6) Acquisition and transfer of real property;

(7) Taxation;

(8) Zoning; and

(9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a).

12 C.F.R. § 34.4(b) (footnote omitted).

In evaluating this clause, it is worth repeating that the OCC has warned national banks that statutory torts like those created by the Consumer Fraud Act could apply to them, implying that the requirements of such laws "only incidentally affect the exercise of national banks' real estate lending powers." *See* OCC Advisory Letter AL 2002-3, 2002 WL 521380 (Mar. 22, 2002). Thus, one cannot reasonably construe "torts" in the savings clause to refer only to common law torts.

Nonetheless, whether the requirement to disclose the existence of a senior lien that the entity also owns would have no more than an "incidental[] affect" on national banks' lending is at least a mixed question of law and fact that cannot be resolved on the pleadings. Wells Fargo's preemption argument would therefore fail at this motion to dismiss stage.

### B. Reliance

A private cause of action under the Consumer Fraud Act requires reliance but such reliance need not be reasonable. (Doc. 26 at 8.) "Unreasonable reliance exists where a party does not have actual knowledge of the deception, but should." (*Id.*) Gerber's original complaint alleged nothing about what he actually knew about the status of the lien on which he bid. The Court therefore dismissed his "complaint with leave to amend

- 14 -

with specifics about what he knew or did not know, including what Gerber's and TDL's title companies told them (if they hired title companies)." (*Id*. at 9.)

Gerber's amended complaint says nothing about title companies, but states that he "did not know or realize that the trustee's sale was on Wells Fargo's junior lien rather than the senior lien on the property." (Doc. 27 ¶ 12.) At oral argument, Gerber's counsel further clarified by reading an e-mail purporting to show that Gerber consulted a title company before bidding on the lien, and the title company erroneously told him that it found no other liens on the property.

Thus clarified, the amended complaint sufficiently pleads reliance. Wells Fargo, however, asserted at oral argument that the e-mail undercuts reliance, reasoning that Gerber relied on the title company's assertions, not any assertion made by Wells Fargo. But Wells Fargo's allegedly fraudulent assertion was the very act of placing its junior lien up for sale, creating a false pretense "that the sale ha[d] a good faith economic purpose, and [was] not simply designed to catch a fool." (Doc. 26 at 7.) Gerber's title company mistakenly reinforced that false pretense, but the Court could locate no authority stating that a third party's mistake that fortuitously confirms a fraudulent misrepresentation somehow shields the one who made that misrepresentation. Accordingly, Gerber has appropriately pleaded reliance.

IT IS THEREFORE ORDERED that "Wells Fargo Bank, N.A.'s Motion to Dismiss Plaintiff's First Amended Complaint" (Doc. 30) is DENIED.

Dated this 9th day of February, 2012.

_____
Neil V. Wake
United States District Judge